IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WANDA GLOVER-DANIELS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| 1526 LOMBARD STREET SNF | : | NO. 2:11-cv-5519 |
| OPERATIONS LLC, | : | |
| *D/B/A LIBERTY COURT* | : | |

MEMORANDUM ORDER

AND NOW, this 16th day of July, 2012, upon consideration of Defendant's Motion for Summary Judgment (Doc. No. 16) and Plaintiff's response in opposition thereto (Doc. No. 20); Plaintiff's Motion for Partial Summary Judgment (Doc. No. 15) and Defendant's response thereto (Doc. No. 19); and Defendant's Motion to File a Reply Brief (Doc. No. 21), it is hereby ORDERED as follows:

1. Defendant's Motion to File a Reply Brief (Doc. No. 21) is GRANTED. The Clerk of Court shall docket Doc. No. 21-1 as "Defendant's Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment."

2. Defendant's Motion for Summary Judgment (Doc. No. 16) is GRANTED.

3. Plaintiff's Motion for Partial Summary Judgment (Doc. No. 15) is DENIED AS MOOT. Because we have granted summary judgment for Defendant, we need not address the legal sufficiency of Defendant's third affirmative defense (the only issue raised by Plaintiff's motion).

4. The Clerk of Court is directed to close this matter for statistical purposes.

I.      Factual Background[1]

This is an age- and race-based employment discrimination case. Defendant Liberty Court ("Liberty Court" or "the Center") is a nursing home located in Philadelphia, PA. The Center employs a diverse workforce, but its employees are predominantly female and black. (See Bosler Decl. Tab A, B). Plaintiff Wanda Glover-Daniels, a 49-year-old African American woman, began working for Liberty Court in 1988 as a payroll coordinator. Over the years, Glover-Daniels took on more responsibility and eventually began performing HR-type duties for Liberty Court. According to both Glover-Daniels and Stacey Martella (the young white woman who took the job Glover-Daniels wanted), at the time Glover-Daniels lost her job, Glover-Daniels had been performing most of Liberty Court's HR functions. Although Glover-Daniels' "official" title, as reflected on her pay stub, was "Manager, Personnel," her business card and employee badge indicated that she was the "Human Resources Manager" for the Center. Prior to the events precipitating this lawsuit, Glover-Daniels had never made a complaint of age or race discrimination at Liberty Court.

Stacey Martella, a 26-year old Caucasian woman, began working at Liberty Court in 2006 as a Scheduling Manager. Among other things, as Scheduling Manager, Martella was responsible for maintaining Liberty Court's nursing coverage on a twenty-four hour a day, seven day a week basis. Less formally, Martella took the initiative to listen to her fellow employees'

---

[1]Because this matter comes before us on Defendant's motion for summary judgment, we set forth the facts drawing all justifiable inferences in favor of Plaintiff Wanda Glover-Daniels, the non-movant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (remarking that "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor" in resolving motions for summary judgment).

work-related concerns and "went above and beyond to try and find a solution" for them. (Martella Dep. 56-58). Martella eventually became Glover-Daniels' "backup," performing (at least some of) Glover-Daniels' duties when she was out. For example, Martella served as Glover-Daniels' backup while Glover-Daniels was out on leave for her father's death from November 18, 2008 to December 21, 2008. Martella continued to function as Glover-Daniels' backup until the time Liberty Court hired Martella as the Center HR Manager and fired Glover-Daniels. In essence, the student replaced the teacher.

Two of the individuals who participated in the decision to hire Martella (and consequently fire Glover-Daniels) were Robert Murray and Colin Bosler. During the relevant time frame, Murray was the Administrator of Liberty Court and Bosler was a Regional Human Resources Manager. Glover-Daniels described her relationship with Murray as "okay," but she felt there was a lack of communication between them because Murray tended to discuss HR issues with Bosler instead of her (go over her head, so to speak). With respect to Bosler, Glover-Daniels would turn to him for help when needed and never had a problem with him (until she was passed-over for the Center HR Manager position, which led to this suit). Glover-Daniels admits that neither Murray nor Bosler ever made a comment to her that was discriminatory on the basis of race or age. (Pl.'s Dep. 109-12). What's more, according to Glover-Daniels, whenever she contacted someone for help at Liberty Court, she never felt that they made any discriminatory comments to her or helped her less than anyone else. (Id.).

In 2008, the region for which Bosler was responsible decided to install Center HR Manager positions at each center in the region in order to provide better center-specific HR support. In other words, the corporate decision to restructure HR was *not* targeted specifically at

Liberty Court or Glover-Daniels, but rather impacted all centers within Bosler's region. As Bosler explained, the Center HR Manager position would require both the ability to handle day-to-day task-oriented support for the center and the ability to problem solve and act as a resource for the Administrator and other staff on a variety of HR-issues.

In August of 2008, Bosler met with Glover-Daniels and explained that they would be restructuring the HR position at Liberty Court, which would bring the job's "grade level" up to the same level as the Scheduling Manager position that Martella currently occupied (level 25, as opposed to level 13 which was the current level of Glover-Daniels' position). At the time, Glover-Daniels thought this was a good idea, primarily because she believed she would get the job (since she was already acting as the Center's HR manager) and receive a raise in accordance with the grade level bump.

In April of 2009, Bosler met with Glover-Daniels again about the soon-to-be restructured HR position at Liberty Court. Bosler told Glover-Daniels that they were moving forward with the plan, and if she was interested in the position, she could apply for it. After hearing this, Glover-Daniels did not understand why she had to apply for the job because, in her mind, she was already doing it. Bosler tried to explain the differences between Glover-Daniels' current position and the position that was going to be introduced, but Glover-Daniels believed (and apparently still does) that there were no real differences between the two.

After getting the news, Glover-Daniels told Martella (her backup) about the creation of the Center HR Manager position, and that Glover-Daniels' position would be eliminated as a result. Martella discussed with Glover-Daniels whether she (Martella) should apply, and Glover-Daniels told her to do it. Although Martella "felt bad about applying . . . [b]ecause [she and

Glover-Daniels] had shared an office and worked closely for three years, and [she] knew that [Glover-Daniels] was also going to be applying," she went ahead and did it. (Martella Dep. 54-55).

On May 13, 2009, Murray placed an advertisement for the Liberty Court Center HR Manager position. (Murray Decl. Tab A). In response, Liberty Court received over twenty (20) resumes. Bosler was responsible for screening the resumes and choosing which candidates to interview. Bosler did so, looking for individuals with skills in employee relations, problem solving, and leadership. Internally, both Glover-Daniels and Martella applied for the position. Bosler interviewed Glover-Daniels in June of 2009.

Glover-Daniels thought the interview went well, but Bosler had some concerns. In particular, Bosler felt that Glover-Daniels often reiterated information that Bosler had previously provided her about his expectations for the position rather than bringing her own thoughts or concepts to the table. (Bosler Dep. 30-31). While Bosler didn't question Glover-Daniels' "task oriented practical experience," he had concerns about her ability to apply HR strategies, concepts, and theories, functions which Bosler felt the Center HR Manager would need to perform. (Id. at 33-37).

Bosler also interviewed several other candidates for the position, including Martella; Nicole Williams (an internal candidate then working at a different center); Frank Bamonti (an external candidate); and Suzan Rogers (another external candidate). Bosler felt that Martella (and other candidates, including Glover-Daniels) had the job experience to perform the day-to-day duties of the Center HR Manager position. Although Bosler had some concerns about

Martella's ability to handle the theoretical and conceptual portions of the position (the same concerns he had about Glover-Daniels):

> One of the things that [Bosler] felt better about in terms of the interview with Ms. Martella was that she had developed a SWOT [Strengths-Weaknesses-Opportunities-Threats] analysis and brought that to the interview and spoke of Liberty Court in terms of the future, in terms of what she felt was currently lacking within that center.  And had used that SWOT analysis to have a conversation with [him] about her plans should she achieve this position and what framework she would use to move forward.

(Bosler Dep. 40:11-22).  Ultimately, Bosler decided to refer five (5) diverse candidates for further interviews: Glover-Daniels (black female, born in 1963), Martella (white female, born in 1983), Bamonti (white male, born in 1948), Rogers (white female, born in 1954), and Williams (black female, born in 1971).  It is undisputed that, of this group of finalists, Martella was the youngest and least experienced.  In fact, Martella admitted during her deposition that she did not have the requisite three (3) to five (5) years of HR experience as provided in the HR Manager job description.  However, Martella did feel as though she had "close to three years' experience" with HR-type duties.  (Martella Dep. 111-12).

In the next stage of the hiring process, Murray selected a number of Liberty Court employees to interview the five (5) remaining candidates: Arthur Lyons (Assistant Administrator); Joe Conrad (Director of Environmental Services); Patricia O'Riordan (Director of Nursing); Mark Drummond (Director of Food Services); Denise Bonanni (Assistant Director of Nursing), and several union representatives (Helen Esposito, Elizabeth Irvin, and Sharon Overton).  Like the candidates themselves, the interview panel was diverse as to gender, race, and age: three (3) men and five (5) women; four (4) black and four (4) white; and birth years ranging from 1946 (older than Glover-Daniels) to 1979 (younger than Glover-Daniels).  Murray

6

felt that his panel selections were a fair representation of the individuals with whom the Center HR Manager would work and people whose opinions he valued. (Murray Decl. ¶¶ 8, 26).

In an August 21st e-mail to the panelists, Murray stressed the importance of their input in the hiring process:

> I need your support in determining which of these candidates gives us the best opportunity to bring a new life to our HR department as we move forward. As you know, our staff satisfaction ratings are near the bottom of the league; and although the HR function is not solely responsible for those results, a good HR Director can make a significant impact in improving morale . . . I will ask you to rate and rank the candidates at the end of the process. Thank you for your assistance in this very important matter.

(Murray Decl. Tab B). Murray sent this e-mail several days before the panel began interviewing the candidates (and thus, before Murray knew how the interviewers would react to and rank Glover-Daniels, Martella, and the other finalists for the HR Manager position). (Id.).

According to Glover-Daniels, none of the interviewers made any disparaging comments toward her about her race or age, and she felt they treated her well during the process. After the interviews, each of the panelists[2] ranked the candidates from one (1) to five (5), one (1) being the best and five (5) being the worst. The results of these interviews, conducted by people who worked with (or at least at the same place as) Martella and Glover-Daniels, revealed a stark contrast between the two. (See Murray Decl. Tab C, D). Of the five finalists, Martella received

---

[2]Some combination of the three union representatives (depending on who was available) provided a joint score for each candidate. Additionally, Glover-Daniels claims that neither Conrad nor Murray interviewed her. (Pl.'s Dep. 242-43). However, it is undisputed that Conrad provided an interview score for Glover-Daniels (her second best score at that). (Murray Decl. Tab C, D). Also, it is undisputed that Murray met with Glover-Daniels on August 24, 2009 (in the midst of the hiring process), and according to Glover-Daniels' e-mail the next day, the meeting had something to do with the Center HR Manager position. (Pl.'s Dep. 252-53). Murray considered that admittedly short meeting an interview. (Murray Decl. ¶ 22). Glover-Daniels did not. (Pl.'s Dep. 263).

the best overall score by far. Excluding Murray, three interviewers (Lyons, O'Riordan, and Bonanni) ranked Martella first, and the three other interviewers ranked Martella either second or third. This gave Martella a total score of 10. (Id.). The next-highest score belonged to Frank Bamonti, with a 15. Nicole Williams scored a 17, and Suzan Rogers scored a 24. (Id.).

Glover-Daniels also scored a 24, tied for the lowest score of the group. Four of the six interviewers besides Murray (Lyons, O'Riordan, Drummond, and Bonanni) ranked Glover-Daniels dead last. (Id.). The individuals who ranked Glover-Daniels last were both black (Lyons) and white (O'Riordan, Drummond, and Bonanni); both men (Lyons and Drummond) and women (O'Riordan and Bonanni); and both younger (Lyons) and older (O'Riordan, Drummond, and Bonanni) than Glover-Daniels. Only the union representatives ranked Glover-Daniels above Martella, and only barely so (they ranked Glover-Daniels first and Martella second). During Glover-Daniels' interview, one of the union representatives (Overton) commented that she didn't think it was fair that Liberty Court was restructuring the position, and she believed it was being done because Glover-Daniels was black. (Pl.'s Dep. 239). According to Glover-Daniels, Overton had apparently heard rumors that Martella had already "gotten the position." (Id. at 239-40). Like several of the other interviewers, Murray ranked Martella first and Glover-Daniels last. (Murray Decl. Tab D).

Murray interviewed the other candidates as well, including Mr. Bamonti. In his deposition, Bamonti acknowledged that Murray "didn't say anything about race . . .," but Bamonti also said that he "felt something" during the meeting with Murray. (Bamonti Dep. 24). Apparently, one of the panelists had commented that Bamonti (an older white man) might not "fit the cultural background" of Liberty Court. (Id. at 24-25). Bamonti "read between the lines"

and took that to mean that he would "stick out like a sore thumb amongst all the black ladies that worked in the building." (Id. at 26). In other words, Bamonti thought Liberty Court would probably prefer an African American individual for the position. (Id. at 47).

During the course of this interview, Murray mentioned to Bamonti that there was a person currently working in HR (presumably Glover-Daniels) who was also applying for the new / restructured position, but that she "had difficulty keeping up with the work she was presently assigned." (Id. at 18). In a different conversation with Bamonti, Murray also stated that the individual currently in HR (again, presumably Glover-Daniels) was black. (Id. at 26-27). According to Bamonti, this reference to Glover-Daniels' race was "just in the form of conversation," and *not* part of the same conversation in which Murray questioned Glover-Daniels' ability to handle the job. (Id. at 27-28).

After the interview process, on September 1, 2009, Murray (with Bosler present) contacted Glover-Daniels by phone and told her that she had not been selected for the Center HR Manager position and that her current position was being eliminated. Essentially, they fired Glover-Daniels. Murray chose to advance Martella to the next stage of the hiring process, for interviews with Bill Merrill (Pennsylvania Director of Human Resources) and Godfrey Streat (Vice President of Human Resources). After interviewing Martella, Merrill and Streat told Murray that they also approved of hiring Martella for the Center HR Manager position. Murray offered the position to Martella, and Martella accepted.

Although a number of people participated in the hiring process, Murray was the ultimate decision maker. (Bosler Dep. 92). Murray implicitly acknowledged this in his Declaration. (See Murray Decl. ¶ 28 ("Mr. Merrill and Mr. Streat reported back to me that they had interviewed

9

Ms. Martella and *supported* her hire for the Center HR Manager position. *I* then offered the job to Ms. Martella and she accepted. If Mr. Merrill and Mr. Streat had *unexpectedly* reported that they could not support Ms. Martella's hire . . ., I would have then sent the next-highest-ranked candidate to them to interview.") (emphasis added)).

After Martella accepted the Center HR Manager job, she also continued to perform the duties of a Scheduling Manager while Liberty Court sought a replacement. Eventually, Liberty Court filled the newly-vacant Scheduling Manager position with an African American woman.

II.     Legal Analysis

Under Federal Rule of Civil Procedure 56(a), we must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." For example, summary judgment is appropriate where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252.

In this suit, Glover-Daniels brings claims under the Civil Rights Act of 1866, 42 U.S.C. § 1981 (race discrimination); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (race discrimination); the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* (age discrimination); and the Philadelphia Fair Practices Ordinance ("PFPO"). The parties agree that the same basic legal framework, including McDonnell Douglas burden shifting,

applies to all of Plaintiff's discrimination claims. (See Doc. No. 16-1, at 4 n.3; Doc. No. 20, at 4 n.2).

For the purposes of this motion, Liberty Court does not appear to challenge Glover-Daniels' ability to state a *prima facie* case of discrimination. Likewise, Glover-Daniels appears to acknowledge that Liberty Court has articulated a "legitimate, non-discriminatory reason" for not hiring Glover-Daniels, i.e., that (1) the candidate pool was diverse, (2) Bosler interviewed each candidate, (3) Murray selected a diverse interviewing panel, (4) the panel ranked Martella as the best candidate and Glover-Daniels as the worst, and (5) Murray relied heavily on the panel interviewers' scores to make his decision. (Doc. No. 20, at 8). As such, Liberty Court's summary judgment motion turns on whether a reasonable jury could conclude that Liberty Court's articulated reason for hiring Martella over Glover-Daniels was in fact pretext for unlawful discrimination. Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933, 938 (3d Cir. 1997) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973)).

"[T]o defeat summary judgment when the defendant answers the plaintiff's *prima facie* case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). In particular, the Third Circuit has explained that:

> [t]o discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the

> employer is wise, shrewd, prudent, or competent. . . . Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.

Id. at 765 (internal citations and quotation marks omitted).

Although this standard undoubtedly "places a difficult burden on the plaintiff," it is necessary in order to strike the appropriate balance "between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." Id. (citation omitted). Of course, our pretext inquiry must account for the totality of the circumstances surrounding the employment decision; we cannot lose the forest for the trees. See Bray v. Marriott Hotels, 110 F.3d 986, 991 (3d Cir. 1997).

Here, Plaintiff raises a number of issues she believes could lead a reasonable jury to conclude that Liberty Court's given reason for hiring Martella was merely pretext for age and/or race discrimination. As discussed *infra*, none of Plaintiff's concerns, alone or in combination, "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Liberty Court's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 765. Therefore, considering the totality of the circumstances and viewing the evidence in the light most favorable to Glover-Daniels, no reasonable jury could find pretext here so summary judgment is appropriate.

First, Plaintiff argues that Liberty Court's business decision to hire Martella over Glover-Daniels and the other candidates is entirely unreasonable and implausible. In particular, Plaintiff faults Liberty Court for hiring the youngest and most inexperienced candidate. Since all the

other finalists for the HR Manager position had significantly more HR experience than Martella did, Plaintiff contends that Liberty Court's hiring decision is one that an employer would "not usually make unless discrimination enters into the picture." (Doc. No. 20, at 14-16). We strongly disagree.

Speaking generally, courts "do not sit as a super-personnel department that reexamines an entity's business decisions." Snik v. Verizon Wireless, 160 Fed. App'x 191, 195 (3d Cir. 2005) (non-precedential) (citation omitted). More particularly, we see nothing wrong or discriminatory about hiring on potential, especially when (1) the less experienced candidate outperforms all the other candidates during the interview process by a wide margin (as Martella did here), and (2) the employer has had an opportunity to see the less experienced candidate in action (as Liberty Court did here, by virtue of Martella's work as Scheduling Manager and backup to Glover-Daniels). As employers undoubtedly know, experience or tenure is oftentimes a poor proxy for quality. See Ratcliff v. Exxonmobil Corp., No. 01–2618, 2002 WL 1315625, at *8-9 (E.D. La. June 13, 2002) (rejecting the idea that experience is a proxy for "better qualified."). Other courts would agree that merely hiring a less experienced candidate does not constitute strong evidence of pretext. See, e.g., Norman v. Reading Sch. Dist., 441 Fed. App'x 860, 865-66 (3d Cir. 2011) (non-precedential) ("Norman rests his argument on the fact that he is more qualified and experienced than the candidates hired and concludes, based on this alone, that the RSD must be discriminating against him because of his age. Unfortunately, a showing that the employer's decision was wrong or mistaken does not suffice for establishing pretext."); Robinson v. Matthews Int'l Corp., 368 Fed. App'x 301, 305-06 (3d Cir. 2010) (non-precedential) (hiring someone with less experience and a lower level of education is not necessarily evidence of

pretext and does not show discriminatory animus); Moss v. BMC Software, Inc., 610 F.3d 917, 923-24 (5th Cir. 2010) ("An attempt to equate years served with superior qualifications is unpersuasive.") (citation and internal quotation marks omitted).

Here, Martella blew away the competition during her interviews, while Glover-Daniels finished (tied for) last. These interviewers were not random strangers, but rather worked at Liberty Court with Martella and Glover-Daniels. As Murray explained, the interviewers' opinions mattered because the HR Manager would have to work with these people. Thus, Murray's greater reliance on the interview scores in comparison to the candidates' HR experience seems eminently reasonable here. What's more, Murray expressed the importance of the interview process *before* the interviews had taken place, which undercuts any inference that his heavy emphasis on interview performance was simply a *post hoc* rationalization for his decision to hire Martella. Further, Martella had at least some HR experience at Liberty Court because she functioned as Glover-Daniels' backup. Finally, by Glover-Daniels' own "experience is everything" rationale, she would not have gotten the job anyway. Both Rogers and Bamonti had more HR experience than she did. (Doc. No. 20 Ex. 17).

Second, Plaintiff argues that Murray's remark to Bamonti during his interview that Glover-Daniels was black would allow a reasonable person to infer that race motivated Murray's decision. Given the context of the comment, we disagree. Although Murray, the person doing the hiring, may have mentioned Glover-Daniels' race shortly before the hiring decision at issue, he did so "just in the form of conversation" with another candidate for the position. We see no evidence that Murray mentioned Glover-Daniels' race (or age, for that matter) to anyone involved in the hiring process or in a negative way. And remember, the tenor of the discussion

between Bamonti and Murray led Bamonti to believe that Murray *would actually prefer an African American* as an HR manager, considering the "culture" of the Center. Looking at the totality of the circumstances surrounding Murray's observation that Glover-Daniels was black, as well as the content of the comment itself, Murray's remark adds little to Plaintiff's allegations of pretext. See Kremp v. Wachovia Bank, N.A., 451 Fed. App'x 151, 156 (3d Cir. 2011) (non-precedential) (recognizing that stray remarks, even by decision makers, unrelated to the decision making process are rarely given great weight) (citation omitted); Parker v. Verizon Pa., Inc., 309 Fed. App'x 551, 558-59 (3d Cir. 2009) (non-precedential) (acknowledging the importance of "the purpose and content of the statement" in "considering whether stray remarks . . . are probative of discrimination.").

  Third, Plaintiff attempts to discredit Liberty Court by pointing out a number of allegedly contradictory statements Liberty Court made. But the statements referenced by Plaintiff are not really contradictory. For example, Plaintiff asserts that she was actually performing most of the Center HR Manager job duties prior to her termination, yet Liberty Court considered her a mere "payroll bookkeeper." That is factually inaccurate. While Mr. Bosler testified that he referred to Glover-Daniels as a payroll bookkeeper, he gave her credit for performing a wide range of HR-type functions and admitted that he might not have remembered all of Glover-Daniels' job responsibilities. (Pl.'s Facts ¶ 67).

  Plaintiff also disputes Liberty Court's assertions that the "new" HR Manager position was somehow different than Glover-Daniels' position, when in fact the position was substantially the same as what Glover-Daniels' had been doing on a daily basis. But according to Bosler, he did not have a problem with Glover-Daniels' "task oriented practical experience" as it applied to the

HR Manager position. Rather, Bosler questioned Glover-Daniels' ability to problem solve and to apply HR strategies, concepts, and theories (qualities Bosler felt the Center HR Manager should possess). Another finalist for the position, Suzan Rogers, confirmed that both Bosler and Murray told her that the job "was going to be multidimensional, handling employee issues, interpreting policy for employees, helping the managers." (Rogers Dep. 16-17). And by her own admission, Glover-Daniels did not engage in strategic planning or creating a vision for the Center during her employment there. (Pl.'s Dep. 102-03).

Next, Plaintiff takes issue with Murray's claim that Martella was the only candidate to present "specific plans and ideas that she wanted to implement if she were offered the position." (Doc. No. 20 Ex. 10). To rebut this assertion, Plaintiff points out that Rogers testified in her deposition that she presented Murray with a *New York Times* article that she thought might be a good training tool for managers. We see no contradiction here. The *New York Times* article was one idea, not "specific plans and ideas" as referenced by Murray.

Moving on, Plaintiff argues that Liberty Court contends that Murray interviewed all the candidates (including Glover-Daniels), but Glover-Daniels insists she did not have an interview with Murray. As discussed *supra*, this is not a contradiction, but simply a difference of opinion. It is undisputed that Murray met with Glover-Daniels on August 24, 2009 (in the midst of the hiring process), and according to Glover-Daniels' e-mail the next day, the meeting had something to do with the Center HR Manager position. (Pl.'s Dep. 252-53). Murray considered that admittedly short meeting an interview. (Murray Decl. ¶ 22). Glover-Daniels did not. (Pl.'s Dep. 263). These varying points of view do not evidence pretext.

In addition, Plaintiff points out that Murray told Bamonti that Glover-Daniels is black, but later denied discussing any of the applicant's ages or races during the interviewing or selection process. That is not entirely accurate. What Murray actually declared, under penalty of perjury, is that (1) he did not consider the race or age of the applicants when he interviewed them or decided to recommend Martella, (2) he never *discussed* the race or ages of any candidates for the HR Manager position with *anyone else involved in the hiring process*, and (3) no one involved in the hiring process ever said anything to him to suggest that they had a preference for a candidate of a certain race or age. (Murray Decl. ¶¶ 29-31). Murray did not declare that he never made a passing mention of someone's race to one of the other candidates for the job.

Plaintiff also intimates that Murray was untruthful with Bamonti when he (Murray) told Bamonti that he had received all favorable responses except for one individual (probably O'Riordan) who said that Bamonti could not relate to the culture of the facility. But Murray's representation to Bamonti was entirely consistent with the interviewers' scores. O'Riordan gave Bamonti his lowest score (a 4), but all the other panelists ranked Bamonti quite highly (1 from Drummond and Conrad; 3 from Lyons, the union representatives, and Bonanni). Overall, Bamonti got the second-highest interview score, lagging behind only Martella.

Plaintiff additionally takes exception to Murray's claim that he considered the candidates' credentials in his rankings but nonetheless gave the candidate with the least experience (Martella) the highest score. But Murray's decision to rank Martella first absolutely comports with his averment that he "ranked the candidates based on [his] interviews with them, their credentials, and, for Ms. Martella and Ms. Glover-Daniels, [his] experience working with them." (Murray

17

Decl. ¶ 20). In this case, interview performance (and Murray's own experience working with Martella and Glover-Daniels) simply trumped length of service / HR experience.

Finally, Plaintiff's assertion that Murray "makes an unsubstantiated allegation that Ms. Glover-Daniels was not 'trustworthy'" misstates the evidence. In fact, Murray merely noted that he "had heard complaints from some staff that they did not believe [Glover-Daniels] was always trustworthy or reliable." (Murray Decl. ¶ 25). In other words, the "staff," not Murray, made the allegations. And in actuality, other Liberty Court employees had implicated Glover-Daniels in some wrongdoing, although they eventually recanted. (See Doc. Nos. 15, 19).

We pause briefly to note that we have addressed (and rejected) each of Plaintiff's alleged inconsistencies in Liberty Court's positions *seriatim*. We have done so because, frankly, there is no other way to deal with the multiple, disparate concerns raised by the Plaintiff. However, we must, and do, realize that the true question is whether, considering the totality of the circumstances, a reasonable jury could find Liberty Court's explanation for hiring Martella over Glover-Daniels pretextual. And for the reasons already discussed, none of the many diverse inconsistencies-that-aren't, alone or in combination, give rise to an inference of pretext in this case.

Fourth, Plaintiff argues that Liberty Court has attempted to "hide the decision-maker" by painting a picture of Messrs. Murray, Bosler, Merrill, and Streat jointly making the decision to hire Martella, when in fact Murray was the ultimate decision-maker. Thus, according to Plaintiff, Liberty Court has created a material factual issue which precludes summary judgment. We see no hiding the ball here. It is undisputed that all four of the aforementioned individuals participated to some extent in the hiring process, with Bosler screening resumes and performing

the initial interviews; Murray setting-up the interview panel, interviewing the finalists, and sending his choice to Merrill and Streat; and Merrill and Streat performing the final interview. But despite the involvement of Bosler, Merrill, and Streat, Murray strongly implied in his Declaration that he essentially made the hiring decision: "Mr. Merrill and Mr. Streat reported back to me that they had interviewed Ms. Martella and *supported* her hire for the Center HR Manager position. *I* then offered the job to Ms. Martella and she accepted. If Mr. Merrill and Mr. Streat had *unexpectedly* reported that they could not support Ms. Martella's hire . . ., I would have then sent the next-highest-ranked candidate to them to interview." (Murray Decl. ¶ 28) (emphasis added).

Finally, Plaintiff implores us to ignore the fact that Liberty Court used other members of Glover-Daniels' protected classes (race and age) in the interviewing and hiring process because human beings can discriminate against their own kind. It is true that the Supreme Court has "rejected any *conclusive presumption* that an employer will not discriminate against members of his own race." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (emphasis added). And rightfully so, as discrimination is a complex phenomenon. But in this case, in which an employer with an admittedly *diverse* (majority-minority, in fact) workforce chooses a *diverse* group of candidates to interview for a position, and a *diverse* interview panel overwhelmingly prefers one candidate to another, and that preferred candidate gets the job, it would strain credulity to infer that discrimination was at work here. While having a diverse interview panel participate in the hiring process might not be dispositive (or "conclusive," as the Supreme Court put it), it certainly cuts against an inference of discrimination. See, e.g., Elwell v. PP&L, Inc., 47 Fed. App'x 183, 188-89 (3d Cir. 2002) (non-precedential) (recognizing that "a

19

plaintiff's ability to raise an inference of discrimination is hampered when the decision maker is a member of the plaintiff's protected class.") (citation omitted); Toliver v. Cmty. Action Comm'n to Help the Economy, Inc., 613 F. Supp. 1070, 1073-74 (S.D.N.Y. 1985) (finding "inference of discrimination . . . attenuated" when adverse employment decision with respect to black male was made by diverse board).

At bottom, considering the totality of the circumstances, the record simply does not "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Liberty Court's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 765. As such, summary judgment for Liberty Court is warranted.

III.     Conclusion

For all the aforementioned reasons, we GRANT Defendant Liberty Court's Motion to File a Reply Brief (Doc. No. 21) and Motion for Summary Judgment (Doc. No. 16). We also DENY AS MOOT Plaintiff's Motion for Partial Summary Judgment (Doc. No. 15). Because we have granted summary judgment for Defendant, we need not address the legal sufficiency of Defendant's third affirmative defense, the only issue raised by Plaintiff's motion. The Clerk of Court is directed to close this matter for statistical purposes.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.